# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

IN RE:

DONALD W. WYATT DETENTION FACILITY                    20-mc-00004

## STATUS REPORT (January 4, 2021)

| Detainees at the Facility | **TOTAL:** | 521 |
|---|---|---|
| | **(% capacity)** | 68% |
| | USMS | 479 |
| | ICE | 34 |
| | Navy, Tribal, BOP | 8 |

| Cumulative number of detainees tested | **TOTAL:** | 5747 |
|---|---|---|
| | Negative tests | 5432 |
| | Pending tests | 0 |
| | Positive cases | 315 |
| | Cleared/Discharged | 313 |
| | Active cases | 2 |
| | (ICE) | 0 |
| | (non-ICE) | 2 |

| Cumulative number of staff tested (as self-reported by staff and through Facility-sponsored testing of staff) | **TOTAL:** | 3149 |
|---|---|---|
| | Negative tests | 2980 |
| | Pending tests | 68 |
| | Positive cases | 101 |
| | Cleared | 96 |
| | Active cases | 5 |

| All efforts undertaken to mitigate the spread of COVID-19 | See Attachment | A |
|---|---|---|

| All efforts undertaken to mitigate the spread of COVID-19 in light of a positive test | See Attachments | A & C |
|---|---|---|

| Protocols for screening and testing of detainees, staff, and others entering or leaving the Facility | See Attachments | A & B |
|---|---|---|

| Changes from Attachment A on prior Status Report, if any | See Attachment | C |
|---|---|---|

Respectfully Submitted,

*/s/ Daniel W. Martin*

Daniel W. Martin, Warden, Donald W. Wyatt Detention Facility

**ATTACHMENT A**
(Facility's Mitigation Efforts and Plan)

## EFFORTS BY THE DONALD W. WYATT DETENTION FACILITY TO MITIGATE AND ADDRESS THE EFFECTS OF THE CORONAVIRUS PANDEMIC

### *Introduction*

1.     With the onset of the current pandemic, the Facility and its staff have been working around-the-clock to ensure that any threats posed by the coronavirus/COVID-19 pandemic are mitigated to the maximum extent possible.

2.     The Facility relies on and routinely refers to the guidelines issued by the Centers for Disease Control and Prevention (CDC) for correctional and detention facilities.

3.     The Facility communicates routinely with representatives from the Rhode Island Department of Health (RIDOH) regarding testing and mitigation strategies.

4.     Beginning on May 13, 2020, the Facility began coordinating and consulting with Rhode Island's Congregate Settings Support Team (CSST), which is a National Guard based team of professionals with medical and infectious disease experience. Specifically, the Facility worked with the CSST on issues such as swabbing/testing, infectious disease mitigation and control best practices, and staffing needs.

### *The Facility's Medical Staff*

5.     The Facility's Medical Director is Edward Blanchette, M.D. Dr. Blanchette is Board Certified in Infectious Diseases and has over 40 years of medical experience, especially in the correctional setting. He has been Medical Director at the Facility since 2010.  Prior to this, he was the Director of Health Services for the Connecticut Department of Corrections for over 20 years. That system had approximately 18,000 inmates throughout Dr. Blanchette's tenure there.

6.      The Facility's Health Services Administrator and Certified Correctional Health Professional (CCHP) is Ronald LaBonte. He has over 25 years of service experience in health care within the correctional environment.

7.      The Facility's Advanced Practice Registered Nurse is Holly Fernandes. Ms. Fernandes has been at the Facility for approximately 15 years.

8.      Finally, the Facility has at least two registered nurses on site during first and second shifts, and at least one registered nurse on site during third shift.

*Specific Steps*

9.      The Facility has implemented strict protocols and undertaken extensive steps to minimize the threat of the coronavirus within the Facility, including, but not limited to:

    a.  Encouraging detainees to socially distance themselves by, among other things, sitting one to two detainees at a four-person table during any non-lockdown mealtimes, providing guidance to avoid congregating in groups, permitting detainees to access the recreation yard attached to their unit on non-lockdown times, and reassigning detainees to available cells when feasible so as to further increase social distancing within the cells;

    b.  Communicating with the United States Marshals Service, ICE, and Bureau of Prisons to minimize sending potential detainees who exhibit COVID-19 symptoms;

    c.  Increasing mental health rounds throughout the Facility during the early phase of the pandemic;

    d.  Ensuring 24/7 on-site presence of nursing staff;

e.  Ensuring that transportation staff communicates in real time with the Facility regarding the detainees' conditions who are arriving at the Facility and to isolate any incoming symptomatic detainees as much as possible;

f.  Testing detainees for SARS-CoV-2 and medically screening new detainees for COVID-19 symptoms;

g.  Establishing a quarantine plan (described below) under the supervision and guidance of the Facility's medical director and in consultation with RIDOH and the CSST;

h.  Prohibiting staff from working who are experiencing any COVID-19 related symptoms, and to report any such symptoms immediately before self-isolating themselves and seeking medical attention;

i.  Requiring staff who have COVID-19 related symptoms to self-quarantine for 14 days and obtain clearance from their medical provider before returning to the Facility;

j.  Encouraging staff to follow the Governor's executive orders by minimizing their time outside of their homes so as to reduce their risks of exposure to the coronavirus;

k.  Encouraging staff to cease unnecessary physical contact such as handshakes, hugs, etc.;

l.  Implementing an enhanced cleaning protocol throughout the Facility;

m.  Providing additional soap, cleaning materials, and sanitizers throughout the Facility for use by detainees and staff;

n.  Cleaning frequently throughout the day and disinfecting tables, chairs, handrails, phone handsets, and other high-touch areas;

o.  Creating an additional night-time cleaning detail to clean and disinfect showers and other common areas with a bleach and water solution;

p.  Initially and temporarily suspending physical visitation to the Facility by family members, attorneys, and other visitors to protect the detainees and their family members during this phase of the pandemic. In mid-June, the Facility reinstated limited non-contact (i.e., through glass) visitation between detainees and their visitors. This process has been formulated in consultation with RIDOH and includes, among other things, verbally screening and temperature testing visitors, obtaining contact information for any contact tracing purposes (if necessary), avoiding any commingling of units, requiring social distancing in any waiting areas, requiring masks to be worn, and sanitizing contact areas in between visits. In response to the Facility's increase in positive cases in October, 2020, the Facility has suspended visitation until further notice;

q.  Screening and limiting vendors and contractors to only those personnel and visits necessary to ensure continuity of operations, such as HVAC vendors and essential deliveries (i.e., medical, food, cleaning supplies, commissary, etc.). The Facility also requires its regular outside contractors to be tested at the same time the Facility conducts staff testing;

r.  Screening vendors and contractors who must enter the Facility for COVID-19 related symptoms and denying entry to any individuals who exhibit such

6

symptoms. This screening consists of a temperature check and answering screening questions regarding potential exposure and risks to the Facility;

s.   Increasing the use of audio and video conferencing services for court appearances and other visits traditionally held in-person, such as between detainees and their attorneys. In September, 2020, the Facility installed approximately 16+ portable touch-screen devices with handsets. These devices will help to facilitate legal/video calls between detainees and their attorneys. They will also allow multiple other users participate via video (such as court staff/personnel) in real-time, much like a Zoom video call. Detainees will also be able to use these devices to review and sign legal documents electronically. This will significantly increase the speed and ease with which detainees can communicate and exchange information and signed documents with their attorneys;

t.   Increasing the number of free phone calls that detainees may make each week as well as reducing the rate that detainees pay for calls;

u.   Restricting and minimizing staff members' physical contact with each other and interactions to the maximum extent possible;

v.   Providing bilingual instruction and guidance to detainees and staff regarding the critical needs to observe strict personal hygiene such as frequent hand-washing, avoiding touching facial areas, maintaining social distancing as much as possible, and promptly reporting any symptoms consistent with COVID-19;

w.  Suspending Facility programs until further notice and working to replace those programs with alternative activities;

x.  Holding town hall-style meetings led by the Warden and the Facility's medical director with the detainees to explain the Facility's efforts, plans, and to assure them that the Facility is working diligently to reduce COVID-19 related risks. At these meetings, detainees requested more soap and personal hygiene products (which were provided), a reduced rate for paid phone calls (which was provided for domestic calls), and more access to Personal Protection Equipment (PPE) such as gloves and procedural masks (which the Facility has provided);

y.  Creating negative-pressure isolation and quarantine units;

z.  Obtaining SARS-CoV-2 testing kits from RIDOH on an as-needed basis; and

aa.  Replacing the currently-suspended in-person religious services with weekly rounds by the Facility's religious coordinator.

***Quarantine and Testing Procedures***

10.  With the input of RIDOH, as of August 19, 2020, the Facility's intake and quarantine procedures are as follows:

a.  The Facility uses J-2 Pod ("J-2") and, if necessary, F-Pod, as the primary intake pods for all new detainees from the United States Marshals Service, Immigration and Customs Enforcement (ICE), the Federal Bureau of Prisons, and the United States Navy. On August 19, 2020, the Facility relocated its ICE detainees to J-1 Pod, which is a negative pressure unit. The Facility made this change to allow it more flexibility in handling the intake quarantine process for new detainees because J-2 is a larger unit;

8

b. J-2 is a large (96 bed) negative pressure unit. It is the Facility's primary quarantine pod and can house up to 96 detainees. The Facility may also use F-Pod (16 beds) as a supplemental location for new detainees if J-2 is full or the Facility needs to use F-Pod to maintain its cohorting arrangements within J-2;

c. The Facility uses J-2 and F-Pod as initial intake holding pods to assess and clear detainees before releasing them into the general population;

d. If necessary, the Facility may also temporarily use one of its multipurpose spaces (before COVID-19, used as a chapel and meeting space) to house new detainees, due to the need to maintain existing cohorts in J-2 and F-Pod, for example (i.e., to avoid introducing new detainees into areas where the Facility previously identified positive detainees). This multipurpose area is equipped with portable cots/linens, detainee showers, restrooms, activity space, televisions, communications tablets, and telephones;

e. Although the Facility currently has two medical isolation units which are negatively pressured, the Facility has turned the entire J-1 pod (48 beds) into a negative pressure isolation unit. And, as of May 8, 2020, the entire I-Pod (female detainees, 40 beds), and the entire K-Pod (special purpose/protective custody, 70 beds) are negatively-pressured. As of May 22, 2020, the entire J-2 pod (96 beds) is negatively pressured. As of June 23, 2020, the entire H-Pod (96 beds) is negatively pressured. Accordingly, as of that date, the Facility has 353 total beds which are negatively pressured;

f.   The Facility screens new detainees by asking them questions regarding their travel history, contact with potential COVID-19 positive individuals, and other risk and exposure factors;

g.   All detainees arriving to the Facility are to be held in quarantine status, medically screened, and ***tested*** for SARS-CoV-2 no more than three days after arrival;

h.   New detainees are monitored and mental health unit staff check in with detainees in the Facility's intake and quarantine units at least twice per week;

i.   During this period, detainees are instructed to self-report any symptoms;

j.   If the detainee's initial test is negative, the detainee remains in quarantine until the detainee is re-tested toward the end of the initial two-week intake period (i.e., 14 days);

k.   If, after this two-test process the detainee is negative in both tests, then the detainee will be cleared for release into the general population, provided that the detainee reports no symptoms;

l.   If a new detainee receives a positive test during this initial quarantine period, the detainee will be placed in an appropriate cohort unit or into one of the Facility's negative pressure units, if available, and closely monitored for symptoms; and

m.   As of the week of October 19, 2020, and per the advice of RIDOH and the CSST, the Facility clears  previously-positive detainees using the protocol set forth at the end of Paragraph 12;

n.   If a new detainee refuses testing, the detainee will be quarantined a minimum of 16 days, screened for symptoms, and cleared for entry into the general population, if appropriate.

*Protocols in the event of a confirmed COVID-19 case*

11.     The Facility frequently reports via email to the governmental entities who entrust their detainees to the Facility's care the status of COVID-19 within its population.

12.     If a detainee tests positive for COVID-19, the Facility has a plan in place to address that situation using all precautions necessary throughout this process. The Facility will, to the extent necessary or advisable under the circumstances:[1]

    a.  Isolate the detainee in the medical isolation unit (if available) or negative pressure unit (if available),[2] ensure that the detainee has a mask to wear, and further medically evaluate the detainee;

    b.  Interview the detainee to determine the nature and extent of their symptoms, the date of their onset, who they recently came into close contact with (i.e., contact tracing, as defined by RIDOH and the CDC), what areas they may have touched, and other specific facts to assess the detainee's condition and their potential impact on staff and other detainees within the Facility;

    c.  Clean and sanitize any areas identified as part of this interview that need to be addressed;

---

[1]     It is difficult to lay out every single step the Facility will take if it has a positive case because of the number of action items that will be required, the exigencies of the situation, and the need to be flexible and adapt to every situation's unique needs. But, nonetheless, this document provides the framework and parameters that will guide the Facility's action.

[2]     A negative pressure environment reduces air pressure so that outside air can be brought into the segregated environment. The goal of this environment is to trap and keep potentially harmful particles within the negative pressure room by preventing internal air from leaving that space.

    d.   Interview other detainees who were identified during the contact tracing process and identify and establish any necessary cohorts as a result of the contact tracing process;

    e.   Secure and isolate the detainee's unit and limit access by staff to those staff necessary and with appropriate protections (masks, gloves, etc.), inform other detainees in the affected unit of the positive case, remind them to wear masks when outside their cells, remind them to report any symptoms immediately, remind them of the importance of personal hygiene and social distancing, and medically screen them as needed;

    f.   Order a SARS-CoV-2 test for any detainee who presents with symptoms necessitating such a test and any detainee whom RIDOH believes based upon contact tracing and exposure should be tested; and

    g.   Advise all necessary parties and agencies, including, but not limited to, RIDOH, the Facility's staff, and its user agencies.

The Facility has several contingency plans in place if it experiences multiple COVID-19 cases. For example, the Facility can handle up to two cases within its Health Services Unit. But, if the number of cases increases, the Facility may use J-2 (96 beds) if appropriate, and, if necessary, F-pod, which has 16 cells. Alternatively, in consultation with RIDOH, the Facility may create and maintain appropriate cohorts in particular locations (including maintaining detainees in their current housing arrangements, if appropriate) in an effort to limit any spread of the disease. For example, as of the date of the June 15, 2020 Status Report, and except for any positive detainees who may be in the Facility's Health Services Unit, the Facility assigned positive detainees together as a cohort in B-Pod. The Facility would then assess the situation to determine the most

appropriate cohorting and living arrangements depending on the specifics of each detainee's situation (i.e., comorbidities, age, risk factors, etc.)

*Protocols for clearing positive cases out of quarantine*: After consultation with RIDOH and the CSST, the Facility may clear a previously positive case out of quarantine when the detainee has had no fever for at least 24 hours without the use of fever-reducing medications and ten or more days have passed since the detainee's positive SARS-CoV-2 test (20 days if immunocompromised).

*General Facility cleaning, sanitizing, and prevention measures*

13.     The Facility has placed COVID-19 related signage from the CDC regarding symptoms, hygiene, and best practices throughout the Facility in English and Spanish. When the Facility holds its town-hall style meetings (including the one it recently held regarding COVID-19), translators are available to assist with any detainee needing translation to ensure the messages are received and understood by all detainees.

14.     Every cell has its own sink and soap is provided to the detainees.

15.     Hand sanitizing is available to the detainees when detainees are out of their cells.

16.     Cleaning chemicals in spray bottles and paper towels are available on the units throughout the day and are consistently monitored and refilled by staff when needed. When detainee workers are out of their cells and working in the pods, they are consistently spraying, wiping, and cleaning high-touch areas such as handles, railings, chairs, tables, screens, microwaves, etc. In addition, the third-shift cleaning crew (while other detainees are in their cells) performs a thorough bleach-based cleaning of each unit which takes an average of several hours each night.

17.     Procedural face masks were initially distributed to staff and detainees. The Facility obtained 2,000 additional masks and is continually in the process of obtaining more masks to have

on hand. On May 21, 2020, the Facility distributed KN95 masks, gloves, soap, and vitamins to its detainees. The Facility also distributes procedural masks and soap to detainees on a regular basis. Detainees are free to obtain additional gloves, masks, and soap upon request.

18.     Although the Facility cannot control the ingress and egress of detainees because such decisions are made by its user agencies, the Facility also communicates regularly with user agencies who are sending new detainees for intake to ensure as much as possible that no COVID-19 suspected or positive detainees are introduced into the Facility.

## ATTACHMENT B
(Screening Protocols)

## __DETAINEES__

| Place Label Here |
|---|

| Detainee Name (Print) | | | | ID# | |
|---|---|---|---|---|---|
| Housing Unit | | Cell # | | DOB | |

| | DETAINEE QUESTIONNAIRE | | | COMMENTS |
|---|---|---|---|---|
| 1. | Fever or Chills: Onset date (    /    /    ) Measured, Highest temp: _____   Current Temp:_____ | **Yes** | No | |
| 2. | Cough                            Onset date (      /   /     ) | **Yes** | No | |
| 3. | Shortness of breath/dyspnea   Onset date (    /    /     ) | **Yes** | No | |
| 4. | Fatigue                         Onset date (     /   /     ) | **Yes** | No | |
| 5. | Sore throat                     Onset date (     /    /     ) | Yes | No | |
| 6 | Headache                       Onset date (      /   /     ) | Yes | No | |
| 7. | New loss of taste or smell    Onset date (    /    /     ) | Yes | No | |
| 8. | Muscle/Body aches            Onset date (   /    /     ) | Yes | No | |
| 9. | Nausea/vomiting               Onset date (     /    /     ) | Yes | No | |
| 10. | Diarrhea                        Onset date (   /    /     ) | Yes | No | |
| 11. | Runny nose/rhinorrhea        Onset date (     /    /     ) | Yes | No | |
| | **HISTORY** | | | |
| A | **Have you been in close contact with a person that has laboratory confirmed Novel Coronavirus Disease-2019 (COVID-19) in the past 14 days? Date of last exposure:          (      /     /     )** | Yes | No | |
| B | **Have you traveled out of New England/New York/New Jersey in the past 14 days? Where? _____ Date:       (      /    /     )** | Yes | No | |
| | **DISPOSITION** | | | |

| A | **Clinical impression ILI or yes to questions: Call HAS/Designee Immediately** | Yes | No | |
|---|---|---|---|---|
| B | **Patient remained in unit?** | Yes | No | |

DRAFT VERSION 16 July 2020

Staff Name (Print)_____

Signature_____

Date:_____ Time:_____

_____     _____

HSA/Designee Review Signature

## STAFF AND VISITORS

### CENTRAL FALLS
### DETENTION FACILITY CORPORATION

### STAFF AND VISITOR
### COVID-19 SCREENING TOOL

| Name (Print) | | DOB | | |
|---|---|---|---|---|

| QUESTIONNAIRE | | | | COMMENTS |
|---|---|---|---|---|
| 1. | Fever or Chills: Onset date (    /   / ) Measured, Highest temp: _____   Current Temp:_____ | Yes | No | |
| 2. | Cough                                Onset date (    /   /   ) | Yes | No | |
| 3. | Shortness of breath/dyspnea   Onset date (    /   /   ) | Yes | No | |
| 4. | Fatigue                            Onset date (   /   /   ) | Yes | No | |
| | | | | |
| 5. | Sore throat                        Onset date (      /   /   ) | Yes | No | |
| 6 | Headache                         Onset date (      /   /   ) | Yes | No | |
| 7. | New loss of taste or smell      Onset date (      /   /   ) | Yes | No | |
| 8. | Muscle/Body aches              Onset date (     /   /   ) | Yes | No | |
| 9. | Nausea/vomiting                 Onset date (      /   / ) | Yes | No | |
| 10. | Diarrhea                           Onset date (    /   /   ) | Yes | No | |
| 11. | Runny nose/rhinorrhea          Onset date (    /   /   ) | Yes | No | |
| HISTORY | | | | |
| A | **Have you been in close contact with a person that has laboratory confirmed Novel Coronavirus Disease-2019 (COVID-19) in the past 14 days?**<br><br>**Date of last exposure:       (     /   /   )** | Yes | No | |
| B | **Have you traveled out of New England/New York/New Jersey in the past 14 days? Where? _____**<br>**Date:      (    /    /   )** | Yes | No | |
| DISPOSITION | | | | |
| A | **Clinical impression ILI or yes to questions: Call Shift Commander Immediately** | Yes | No | |

DRAFT VERSION 16 July 2020

Staff Name (Print)_____
Signature_____

Date:_____ Time:_____

Reference: https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

**ATTACHMENT C**
(Changes from last Status Report)

The following paragraph(s) identify and highlight any key changes made to Attachment A from the last Status Report and provides additional current information.